**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALEX J. ALVARADO,

*Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL SECURITY,

*Defendant*.
_________________________________/

CASE NO. 20-11717

HON. MATTHEW F. LEITMAN
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 8, 9.)**

## I. RECOMMENDATION

Plaintiff Alex Alvarado challenges Defendant Commissioner of Social Security's final decision denying his claim for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income benefits ("SSI"). The case was referred to me for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's final decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 8), **GRANTING** the Commissioner's motion, (ECF No. 9), and **AFFIRMING** the Commissioner's final decision.

## II. REPORT

### A. Introduction and Procedural History

Plaintiff's applications for DIB and SSI were filed on January 19, 2018. (ECF No. 6-5, PageID.197–203.) For the purposes of DIB and SSI, Plaintiff alleged he became disabled on October 1, 2015. (*Id.* at PageID.199, 201.) The Commissioner denied the claims. (ECF No. 6-4, PageID.109–39.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on May 14, 2019. (ECF No. 6-2, PageID.53–78.) The ALJ issued a decision on June 10, 2019, finding that Plaintiff was not disabled. (*Id.* at PageID.32–52.) The Appeals Council denied review on April 23, 2020. (*Id.* at PageID.21–26.) Plaintiff sought judicial review on June 26, 2020. (ECF No. 1.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 8–10.)

### B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

**C. Framework for Disability Determinations**

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 6-2, PageID.49.) At step one, the ALJ found Plaintiff met the insured status requirements through September 30, 2016. (*Id.* at PageID.37.) Plaintiff had not engaged in substantial gainful activity from the alleged onset date of October 1, 2015. (*Id.*) At step two, the ALJ concluded that Plaintiff's severe impairments were ulcerative colitis, pancolitis, depression, and anxiety. (*Id.*) These impairments did not meet or medically equal a listed impairment at step three. (*Id.* at PageID.38.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). In addition, [Plaintiff] can perform simple routine repetitive tasks." (*Id.* at PageID.42.) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.47.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.* at PageID.47–48.) This included housekeeper, stock clerk, and office clerk. (*Id.* at PageID.48.) Accordingly, Plaintiff was found to be not disabled. (*Id.* at PageID.49.)

### E. Administrative Record

#### 1. Overview of Medical Evidence

##### a. Treatment Notes

Plaintiff claimed in his disability report for his application for DIB/SSI that his physical and mental conditions that limit his ability to work include pancolitis, inflammatory bowel disease, and major depression. (ECF No. 6-6, PageID.217.)

Plaintiff has a lengthy medical record with the VA Medical Center in Ann Arbor. Records showed Plaintiff's care began in August 2014, where his chief complaint was stress-related diarrhea. (ECF No. 6-11, PageID.1117.) Plaintiff described experiencing six to eight episodes of diarrhea, which recently increased to 10–12 episodes per day. (*Id.* at PageID.1113.) Plaintiff has a past medical history of irritable bowel syndrome, rosacea, alcohol abuse, and tobacco use disorder. (*Id.* at PageID.1117.) The plan for Plaintiff included tests and a follow up in three months. (*Id.* at PageID.1118.) Plaintiff was screened for alcohol use, depression, and PTSD; each were negative. (*Id.* at PageID.1120–21.) Plaintiff's pain score was a two and located in the stomach. (*Id.* at PageID.1121.) He exercised three or more times per week. (*Id.*) Plaintiff also endorsed symptoms of abdominal pain between 4/10 and 8/10, dizziness, racing heartbeat, fatigue, weight loss, and weakness. (*Id.* at PageID.1113.) Plaintiff underwent a colonoscopy in September 2014. (*Id.* at PageID.1099.) At that time, he had a steady gait and his pain was 4/10. (*Id.* at PageID.1111.) The impression following the colonoscopy was suggestive of inflammatory bowel disease ("IBD"). (*Id.* at PageID.1100.) There was consideration of 5-ASA medication for Plaintiff. (*Id.*) In the assessment of a consultative examination that followed the colonoscopy, Plaintiff's IBD was described as moderately severe, based on his symptoms and stool frequency. (*Id.* at PageID.1075.) Here, it was recommended to treat the IBD with 5-ASA and steroid medication. (*Id.*) His biopsies showed ulcerative colitis. (*Id.* at PageID.1060.) Plaintiff's condition improved to two to three bowel movements per day with using Prednisone and tapered medication. (*Id.* at PageID.1057.)

In November 2014, Plaintiff reported recurring pain and diarrhea symptoms as medication was tapered. (*Id.* at PageID.1052.) His medication plan was modified to continue taking Lialda and to add Imuran. (*Id.*) Later, in December 2014, Plaintiff—through his mother—reported that Plaintiff was experiencing abdominal pain, nausea, vomiting; and 12 lbs. of weight loss in the last three weeks[1]. (*Id.* at PageID.1053.) Plaintiff's pain was between 4/10 and 9/10. (*Id.*) Plaintiff was admitted to a non-VA hospital for malnutrition. (*Id.* at PageID.1054.) His issue there also included an ulcerative colitis flare. (ECF No. 6-9, PageID.791.) Plaintiff's plan included medication and a soft diet. (*Id.* at PageID.791–92.) Imuran was noted to cause severe nausea for Plaintiff. (*Id.* at PageID.791.)

Also, in December 2014, Plaintiff met with a social worker for assist with his hospital discharge. (*Id.* at PageID.787.) Plaintiff was described as having an appropriate affect, a euthymic mood; and he was alert and oriented. (*Id.*) Plaintiff is independent with his ADLs, but he does not have a driver license. (*Id.* at PageID.787–88.) Plaintiff experienced recurring increased bowel movements, and the medical response included increased medication with a plan for tapering down the dosage. (*See*, *e.g.*, *id.* at PageID.743–45.) Plaintiff underwent a colonoscopy; the impression included moderate-severe inflammation of the large intestine secondary to Plaintiff's ulcerative pancolitis. (*Id.* at PageID.726–27.) An esophageal endoscopy showed a normal esophagus and stomach. (*Id.* at PageID.724.) Plaintiff had discussions about taking Remicade. (*Id.* at PageID.678–

[1] From the summer to this point in time (December 2014), Plaintiff's weight went down to 140 lbs. from 200 lbs. (ECF No. 6-9, PageID.765.)

80.) An impression from an MRE imaging test suggested that Plaintiff did not have Crohn's disease. (*Id.* at PageID.673.) Plaintiff began taking Remicade. (*Id.* at PageID.666.) By January 2015, Plaintiff was down to one bowel movement daily. (*Id.* at PageID.637.) His physician stated, regarding Plaintiff's inflammation, that the inflammation "appears inactive and given robust improvement in Hb, I suspect remicade has been very efficacious." (*Id.*) There were no complications of IBD. (*Id.*)

In April 2015, at a gastroenterology follow-up appointment, it noted Plaintiff's ineffective initial medication regimen and Plaintiff's significant symptom improvement with Remicade. (*Id.* at PageID.628.) Plaintiff was off steroids since March. (*Id.*) He reported bathroom use twice daily. (*Id.*) He also reported daily morning nausea and pain. (*Id.*) Plaintiff was directed to try omeprazole for the abdominal pain and nausea. (*Id.* at PageID.629.)

In August 2015, Plaintiff discussed his medical marijuana use with his doctor. (*Id.* at PageID.622.) Plaintiff reported four bowel movements daily and nausea. (*Id.* at PageID.621.)

In March 2016, Plaintiff described his symptoms as being well controlled. (*Id.* at PageID.603.) While he had intermittent abdominal discomfort, overall, he believed he was doing well. (*Id.*)

In January 2017, Plaintiff experienced worsened symptoms. (*Id.* at PageID.578–80.) The impression was that it was unclear if that was a flare of ulcerative colitis. (*Id.* at PageID.580.) Plaintiff received recommendations for medication, for a colonoscopy, and to follow up with the GI clinic. (*Id.*)

The impression of Plaintiff's last endoscopy in April 2017 was that the examined portion of the ileum was normal, and that overall disease appears to be improved but that monitoring should continue. (ECF No. 6-8, PageID.525.)

In August 2017, Plaintiff was hospitalized after a suicide attempt. (*Id.* at PageID.503–13; *see also* ECF No. 6-7, PageID.249–71.) The events that preceded this attempt included his job loss, the death of his dog, and his lost custody of his son. (*Id.* at PageID.494.) Plaintiff later denied feelings of suicide. (*Id.*) Also later, Plaintiff indicated he had "'things to live for'", he wanted to work on coping skills, and he exercised regularly. (*Id.*) Plaintiff's diagnoses included unspecified depressive disorder and unspecified anxiety disorder. (*Id.* at PageID.492.) The plan for Plaintiff, here, included referral to psychotherapy; and no psychotropic medication at this time. (*Id.* at PageID.495.) Plaintiff was described as having a rapid improvement in his mental status and having no history of recent sustained depressive mood or observed behaviors suggesting moderate-severe depression. (*Id.* at PageID.456.) He declined antidepressants for mood, but medication will continue for sleep and anxiety. (*Id.* at PageID.451.)

In September 2017, Plaintiff injured his wrist working out by hitting heavy bags. (*Id.* at PageID.429.)

Plaintiff received case management services for his anxiety and depression disorders. (*See*, *e.g.*, ECF No. 6-8, PageID.361–62, 365–66, 410–13, 424–25.)

In December 2017, it was noted that Plaintiff was experiencing worsening symptoms, and that his scheduled Remicade dosage was off because of scheduling issues. (*Id.* at PageID.393.)

In the record here in January 2018, it was noted that Plaintiff worked full time at his father's business. (*Id.* at PageID.365.) Plaintiff reported having an "'up and down'" mood. (*Id.* at PageID.352, 361.) Plaintiff described stresses related to finances, child support, potential arrest, and living arrangements. (*Id.* at PageID.361.) Plaintiff's nortriptyline medication was increased for his mood. (*Id.* at PageID.364.)

**b. Opinion Evidence**

In August 2015, Dr. Shail Govani opined that Plaintiff was unable to work approximately from September 2014 to February 2015, due to severe diarrhea-related illness. (ECF No. 6-9, PageID.620.)

Plaintiff's case was reviewed by state agency Drs. Mika and Csokasy. (ECF No. 6-3, PageID.80–101.) Dr. Mika's assessment was that "Despite the presence of MDI, evidence in file is not sufficient to demonstrate [Plaintiff's] function from AOD 12/2014 to DLI expiration date 9/2016 as there are not consistent exams throughout the file nor function information to cover this entire time frame." (*Id.* at PageID.85.) Next, as to Dr. Csokasy's assessment, he found Plaintiff had severe impairments of inflammatory bowel disease, depressive disorder, and anxiety disorder. (*Id.* at PageID.85–86.) While Plaintiff was found to have medically determinable impairments that could reasonably produce Plaintiff's symptoms, Plaintiff's conditions were stable, and he reported working up to 30 hours per week. (*Id.* at PageID.87.) Plaintiff's statements, therefore, were partially consistent. (*Id.*) No RFC assessment was made with Plaintiff's DIB claim. (*Id.*) Plaintiff was found to be not disabled. (*Id.* at PageID.88.) Turning to the time period relative to his SSI claim, Plaintiff had exertional limits of occasionally lifting 20 pounds and frequently

lifting 10 pounds. (*Id.* at PageID.96.) Plaintiff could stand, walk, or sit for a total of six hours in an eight-hour workday. (*Id.* at PageID.96–97.) Plaintiff could frequently climb stairs, stoop, kneel, crouch, and crawl; and occasionally climb ladders. (*Id.* at PageID.97.) He had no manipulative limitations. (*Id.*) Plaintiff had concentration and persistence limitations: his ability to carry out detailed instructions and his ability to maintain attention and concentration were moderately limited. (*Id.* at PageID.98.) Plaintiff could perform simple and routine tasks on a sustained basis in a low stress environment. (*Id.* at PageID.95.)

### 2. Application Reports and Administrative Hearings

#### a. Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that he was born March 3, 1987 and was 32 at the time of the hearing. (ECF No. 6-2, PageID.56.) Plaintiff did not drive nor did he have a license. (*Id.* at PageID.57.) Plaintiff's education included some college classes, including one class currently. (*Id.*) He was living alone. (*Id.* at PageID.58.) He last worked on a full-time basis in 2012, with some part-time work afterward. (*Id.* at PageID.58–59.) Plaintiff's work history included working for father's automotive business. (*Id.* at PageID.59.) It was a clerical position, where Plaintiff answered phones and scheduled appointments. (*Id.*) There, Plaintiff spent more time sitting rather than standing or walking, and he did not lift weight that often. (*Id.* at PageID.59–60.) Plaintiff was also a hospital corpsman in the military; there, he was standing or walking more than sitting, and he had to lift or carry at least 150 pounds. (*Id.* at PageID.60–61.)

Plaintiff stated he could not do his past work because of his depression and pancolitis. (*Id.* at PageID.61–62.) The ALJ and Plaintiff reviewed Plaintiff's medical history. In December 2014, Plaintiff was hospitalized with a diagnosis of pancolitis. (*Id.* at PageID.62.) Plaintiff received infusion treatments since his diagnosis. (*Id.* at PageID.63.) His schedule of infusion treatments also increased in frequency since his hospitalization. (*Id.*) Plaintiff's bowel movements, following an infusion, occurred about three to six times per day. (*Id.* at PageID.64.) Later, when getting closer to the next infusion, Plaintiff's bowel movements occurred about 10 times per day, for five to 20 minutes each. (*Id.* at PageID.65.) Plaintiff's abdominal pain starts out at 7/10 and, with medication, it is at 5/10. (*Id.*) Plaintiff tried to control his symptoms with his diet, but he had difficulty maintaining this with his difficulty travelling. (*Id.*) Plaintiff also stated because of his pancolitis and his depression, he was likely to remain home for four to five days of the month. (*Id.* at PageID.66.) Plaintiff engaged in some exercise, which was described as Tae Kwon Do (but that did not last past a couple of sessions) and light cardio, to control flare ups. (*Id.* at PageID.67–68.)

Plaintiff noted that doctors have recommended infusion treatments, and removing his colon and replacing it with a colostomy bag. (*Id.* at PageID.68.) Plaintiff experienced back pain, with lifting weight, because of his sciatic nerve. (*Id.*) He had not received treatment for this because of side-effects related to his ulcerative colitis. (*Id.* at PageID.69.) Plaintiff does not sleep well at night. (*Id.*)

Regarding Plaintiff's daily living activities, Plaintiff can clean himself and make a meal a day. (*Id.*) Plaintiff could shop at a store without issue. (*Id.*)

Plaintiff took medication for his depression and pancolitis. (*Id.* at PageID.69, 71.) Plaintiff was hospitalized last in August 2017, and that was alcohol related. (*Id.* at PageID.69.) Plaintiff last drank alcohol with that event. (*Id.*) Plaintiff had not been hospitalized for any reason since that time. (*Id.* at PageID.70.) He had good days and bad days related to his mental status. (*Id.*) He had about four or five good days in a week, and in contrast, on the bad days he did not leave his room or bed. (*Id.*) Plaintiff took medication for his mental health, and he described the medication's side effects as "More depression." (*Id.*) He described his system of taking medication according to the prescription and to take them every morning, otherwise he will feel the difference. (*Id.* at PageID.71.)

Plaintiff stated he had a good memory. (*Id.*) He also stated he had a lot of social anxiety. (*Id.*) Plaintiff did not go out much, and he did not handle crowds well. (*Id.*)

**b. The Vocational Expert's ("VE") Testimony at the Administrative Hearing**

The VE characterized Plaintiff's past work as receptionist and medical assistant. (ECF No. 6-2, PageID.75–76.) The VE inquired of a hypothetical person of Plaintiff's age, education, and work experience, and with the limitations of light work that was limited to simple, routine, repetitive tasks with occasional interaction with the general public. (*Id.* at PageID.76.) The VE indicated that Plaintiff's past work would not be available. (*Id.*) The VE identified jobs available in the national economy, under these limits, as housekeeper, 400,000 jobs; stock clerk, 220,000 jobs; and office clerk, 190,000 jobs. (*Id.*) The VE indicated that absence of more than two days per month, because of physically induced symptoms, would be work preclusive. (*Id.*) If the individual was off-task for 15% of the

workday, for the same reasons, then that also would be work preclusive. (*Id.* at PageID.76–77.) The VE stated her education and experience was the for her conclusions as to these limitations and the *Dictionary of Occupational Titles*.

**F. Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

> (1) Licensed physician (medical or osteopathic doctor);
>
> (2) Licensed Psychologist, which includes:
>
> > (i) A licensed or certified psychologist at the independent practice level; or
> >
> > (ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;
>
> (3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;
>
> (4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;
>
> (5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency

> in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;
>
> (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];
>
> (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or
>
> (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important

factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

> (i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);
>
> (ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

> (iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);
>
> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);
>
> (v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the

factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i) Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

> (ii) Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];
>
> (iii) Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];
>
> (iv) Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];
>
> (v) Statements that you do or do not meet the requirements of a medical-vocational rule[]; and
>
> (vi) Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable

clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and

persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the

objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i) [D]aily activities;

(ii) The location, duration, frequency, and intensity of . . . pain;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, . . . received for relief of . . . pain;

(vi) Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1) The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4) The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5) The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

**G. Arguments and Analysis**

Plaintiff argues that the ALJ failed to create an accurate RFC, and therefore erroneously found Plaintiff capable of work at step five of the sequential analysis. Plaintiff is incorrect.

But before each purported error is considered, it is necessary to address fundamental aspects of Plaintiff's argument relative to judicial review of the ALJ's decision. First, Plaintiff has the burden of proving he is disabled. 20 C.F.R. §§ 404.1512, 416.912. More specifically, Plaintiff has the burden to provide the evidence that supports the RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999). Next, generally, Plaintiff raises error in a manner that raises a claim without providing support, leaving the Court to attempt to search the record for support. That is contrary to Plaintiff's obligations. *Deguise v. Comm'r of Soc. Sec.*, 2013 WL 1189967, at *7 (E.D. Mich. 2013) ("[P]laintiff cannot simply make the claim that the ALJ erred . . ., while leaving it to the Court to scour the record to support this claim."), *rep. & rec. adopted*, 2013 WL 1187291 (E.D. Mich. 2013).

Finally, generally, Plaintiff's purported errors are inviting the reweighing of evidence already considered by the ALJ. But the Court will not reweigh evidence considered by the ALJ. *Seibert v. Comm'r of Soc. Sec.*, 2019 WL 147066 at *2 (E.D. Mich. 2019) (citing *Big Ranch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013)). Further, an ALJ's decision will be affirmed if it is supported by substantial evidence, even if there is substantial evidence of another conclusion in the record. *See Cutlip*, 25 F.3d at 286.

**1. The alleged absence of limitations found in the RFC.**

In the RFC, the ALJ limited Plaintiff to light work with simple routine repetitive tasks. But the precise language the ALJ used was "In addition, the claimant can perform simple routine repetitive tasks." (ECF No. 6-2, PageID.42.) Plaintiff asserts "There is no possible way for this Court to determine the intentions of the ALJ . . . and remand is appropriate." (Pl. Br., ECF No. 8, PageID.1610.) This assertion ignores the regulations that guide the assessment of the RFC and it ignores the inquiry of the VE. The RFC "is *the most* you can still do despite your limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (emphasis added). Further the ALJ inquired of the VE about work being "limited to simple, routine, repetitive tasks." (ECF No. 6-2, PageID.76.) From that context and the regulation, simple routine repetitive tasks are a limitation. Next, Plaintiff cannot argue that the ALJ failed to analyze Plaintiff's mental condition and is due remand, under *Reynolds v. Comm'r of Soc. Sec*, 424 F. App'x 411, 416 (6th Cir. 2011), precisely because the ALJ in fact included the mental limitation of simple routine repetitive tasks. *See Trejo v. Comm'r of Soc. Sec.*, 2017 WL 4925691, at *3 (E.D. Mich. 2017) (The ALJ "appropriately considered [Plaintiff's] mental impairment, as she specifically limited [Plaintiff] to no more than

simple, routine repetitive tasks . . . ."), *rep. and rec. adopted*, 2017 WL 3768943 (E.D. Mich. 2017).

Plaintiff makes a counter-assertion that, assuming that the above limitation was in fact found, the RFC is "overly broad and would still not provide limitations to account for Plaintiff's physical impairments, mental severe impairments, and associated symptoms." (Pl. Br., ECF No. 8, PageID.1611.) Perhaps Plaintiff meant to say that the RFC is too narrow in that it does not account for all limitations associated with Plaintiff's physical and mental impairments. Considering the proceeding assertions, I will go forward with that understanding and address each in turn.

**2. RFC limitations related to Plaintiff's severe physical impairments.**

Plaintiff asserts—with his severe impairments of ulcerative colitis and pancolitis and related symptoms of frequent bowel movements, abdominal pain, etc.—that he needs limitations related to unplanned breaks, to be absent two days per month, and to be off-task. (*Id.* at PageID.1611–12.) Plaintiff cites to the record of his testimony before the ALJ and his history of present illness in treatment notes to substantiate his symptoms. Plaintiff seems to suggest here that if he claims he has a symptom, then that requires a corresponding work-related limitation based on the medical record with his claim. If that is the suggestion, that is contrary to the evaluation process of Plaintiff's disability. First, his statements alone do not establish that he is disabled. 20 C.F.R. §§ 404.1529(a), 416.929(a). Further, "ALJs are not required to accept a plaintiff's testimony . . . as support for a more restrictive RFC." *Breidenich v. Saul*, 2020 WL 5521409, at *5 (E.D. Mich. 2020). Also, "Statements that

appear in the 'history of present illness' section are 'merely the narrative description of plaintiff's subjective complaints and symptoms and are not opinions regarding plaintiff's limitations or restrictions.'" *Daniels v. Comm'r of Soc. Sec.*, 2018 WL 5118595, at *7 (E.D. Mich. 2018), *rep. and rec. adopted* 2018 WL 4658998 (E.D. Mich. 2018) (quoting *McCready v. Comm'r of Soc. Sec.*, 2012 WL 1060088, at *8 (E.D. Mich. 2012)). The ALJ's evaluation of Plaintiff's symptoms and his pain follows SSR 16-3p and the corresponding regulations, to ascertain the consistency of the symptom claims with the relevant medical evidence. Plaintiff cites no medical or opinion evidence, other than his own opinion, that supports a conclusion that Plaintiff requires these limitations, nor does he cite to evidence that the ALJ failed to consider. Further, as to the consideration of Plaintiff's subjective complaints, the ALJ found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of [Plaintiff's] symptoms are not entirely consistent with the evidence of record." (ECF No. 6-2, PageID.43.) More specifically, the ALJ considered the controllability of Plaintiff's symptoms with medical care, the absence of hospitalization for pancolitis, Plaintiff's ability to exercise and to take a college class of three credits. (*Id.* at PageID.45–46.) Plaintiff has not shown error in the evaluation of the medical evidence or the evaluation of his subjective symptoms.

**3. RFC limitations related to Plaintiff's severe mental impairments.**

Plaintiff asserts that—with his severe mental impairments of depression and anxiety—he needs limitations related to his off-task time, his pace performance, his ability to remember/carry out instructions, his decision making for simple work-decisions, and his ability to sustain a routine. Here, the record that Plaintiff cites in support of his argument

includes his own testimony, one history of present illness that provide details of the suicide attempt, and one social workers assessment that recites Plaintiff's "up and down" mood. This assertion is almost identically incorrect as the previous argument.

Again, Plaintiff's subjective claims of his symptoms, alone, do not determine his disability; and similarly, appropriate limitations follow the consideration of the medical evidence and Plaintiff's symptoms or pain that are consistent thereto. Plaintiff cites no medical or opinion evidence that supports a conclusion that Plaintiff requires these limitations, nor does he cite to evidence that the ALJ failed to consider.

Within this assertion, Plaintiff also asserts that the RFC's limit of simple, routine, repetitive tasks is does not accurately account for Plaintiff's moderate limitation in his abilities of concentration, persistence, and pace. Plaintiff cites to no medical record or opinion to support this. Plaintiff relies on court cases—*Green v. Comm'r of Soc. Sec.*, *Edwards v. Barnhart*, and *Walker v. Barnhart*[2]—for the propositions that a 1) moderate limitation in concentration impacts 20%–30% of the time at work or impacts the ability to meet quotas/pace or stay alert and 2) that unskilled work does not account for the non-exertional limitations of depressive disorders. Plaintiff is incorrect. *Green*'s suggestion that a moderate limitation in concentration, persistence, and pace renders a plaintiff *per se* disabled has been rejected. *See England v. Comm'r of Soc. Sec.*, 2016 WL 8114219 at *13 (E.D. Mich. 2016) (collecting cases where *Green* was either rejected or used without further analysis), *rep. and rec. adopted*, 2016 WL 5939288 (E.D. Mich. 2016). Next,

---

[2] *Green*, 2009 WL 2365557 (E.D. Mich. 2009); *Edwards*, 383 F. Supp. 2d 920 (E.D. Mich. 2005); *Walker*, 258 F. Supp. 2d 693 (E.D. Mich. 2003).

*Edwards* "cannot be read to impose a bright line rule for accounting for concentrational deficiencies." *Bondarenok v. Comm'r of Soc. Sec.*, 2020 WL 5415231, at *6 (E.D. Mich. 2020), *rep. and rec. adopted*, 2020 WL 5370198 (E.D. Mich. 2020). Lastly, the *Walker* case has, in the foundation of its holding, a mistaken interpretation of the case of *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235 (6th Cir. 2002). And "the Sixth Circuit later rejected" the mistaken interpretation. *See Perdue v. Colvin*, 2017 WL 362668, at *3 (E.D. Mich. 2017) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004), *rep. and rec. adopted*, 2017 WL 976790 (E.D. Mich. 2017). These cases are not supportive of Plaintiff.

In this case, Dr. Csokasy found Plaintiff would have moderate limitations in maintaining attention and concentration and further found Plaintiff "would have difficulty completing complex tasks on a sustained basis". (ECF No. 6-3, PageID.98–99.) Here, the ALJ's assessed limitation to simple, routine, repetitive tasks is in accord with a moderate limitation in ability to concentrate or maintain attention. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (2014).

Thus, the ALJ did not err in the assessment of the limitations related to Plaintiff's mental impairments.

**4. RFC limitations related to Plaintiff's non-severe impairments**

Plaintiff asserts the ALJ did not consider limitations related to Plaintiff's non-severe impairments. This assertion is incorrect. The ALJ stated

> Any additional impairments, alleged and found elsewhere in the record, including, but not limited to history of left shoulder surgery, mild degenerative changes of the spine and shoulders, head contusion, asthma,

> respiratory infection, sinusitis/rhinitis, anemia, and sciatica, if medically determined, *are not severe* because those conditions do not satisfy the necessary criteria. Specifically, either the other conditions have not been diagnosed by acceptable medical/psychological sources, responded to/resolved with treatment, caused no more than minimal work related limitations, did not last or were not expected to result in more than minimal work-related restrictions for a continuous period of at least twelve months (i.e. the durational threshold of disability); and/or were not expected to result in death.

(ECF No. 6-2, PageID.38.) (Emphasis added. Citations omitted.) It is correct that the ALJ must account for the limiting effects of non-severe impairments in the RFC (see 20 C.F.R. §§ 404.1545(e), 416.945). The ALJ clearly explained the absence of the limiting effects of these additional impairments. Plaintiff, on the other hand, cites to no specific limitation needed, no medical record in support of same, and no instance of the ALJ failing to consider same. Again, it is Plaintiff's burden to provide this evidence, and the Court will not reweigh the evidence considered by the ALJ.

**5. RFC limitations related to side-effects of Plaintiff's medication**

Plaintiff argues the ALJ failed to consider side-effects of medication with the inquire to the VE and within the RFC, and thus this is reversable error. Plaintiff is incorrect. Plaintiff asserts his subjective complaints of increased depression and nausea lead to him to being off-task and have unexcused absences.

"There is no question that subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Again,

contrary to his obligation, Plaintiff provides no support for his claim other than subjective complaints[3].

Plaintiff cites *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789–90 (6th Cir. 2009) for the proposition that hypothetical questions to the VE must account for medication

---

[3] Plaintiff asks, "what is the point of even gathering hearing testimony from a claimant if the ALJ is just going to discount everything he/she testified about during the hearing and claim that the statements are inconsistent with the record?" (Pl. Rep., ECF No. 10, PageID.1653.) Further, he states "there is an assumption that Plaintiff told the truth, plus his testimony is supported by the record, and therefore, his subjective complaints and medication side effect should be taken as truthful and given proper weight." (*Id.* at PageID.1653–54.)

Plaintiff provides no basis—either case law, statute, regulation, interpretation ruling, or anything—for this alternative evaluation of a claimant's disability.

"At a hearing, the [ALJ] looks fully into the issues, [and] questions [the plaintiff] and the other witnesses . . . ." 20 C.F.R. §§ 404.944, 416.1444. The hearing is to be a "full and fair investigation" so that the ALJ can "develop the relevant facts so that he could fully and fairly evaluate the case." *James v. Bowen*, 793 F.2d 702, 705 (5th Cir. 1986). An ALJ must consider "*all of the available evidence*, including [the plaintiff's] medical history, the medical signs and laboratory findings, and *statements about how your symptoms affect you*." 20 C.F.R. §§ 404.1529(a), 416.929 (emphasis added). *See also* SSR 16-3p. Similarly, there is consideration of statements of descriptions and observations of limitations in assessing the plaintiff's residual functional capacity. 20 C.F.R. §§ 404.1545, 404.945. Clearly, in general, a plaintiff's statements *can* provide additional information and context about the extent of that plaintiff's claimed disability and limitations, and—where relevant and consistent—provide support for additional work-related limitations. That is *not* to say that a plaintiff's statements have primacy over other evidence, as "[d]iscounting credibility . . . is appropriate where an ALJ finds contradictions among the medical reports, [plaintiff's] testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

As noted throughout the opinion, Plaintiff frequently cites his own subjective complaints and the medical record that recites his subjective complaints. But the establishment of a medically determinable impairment and assessment of residual functional capacity always relate back to the objective medical evidence. Relevant here, "if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacity to perform work-related activities . . . ." SSR 16-3p.

Plaintiff cites to no consistent medical evidence or opinion, other than his appropriately discounted subjective statements. Plaintiff argues no procedural error that the ALJ failed to consider evidence or failed to support a factual finding with relevant evidence.

In sum, using the evaluation procedure provided by law, regulation, and interpretive ruling, there is no error by the ALJ.

side effects. Plaintiff overstates the case. *White* considered that plaintiff's subjective complaints with the consistency of that plaintiff's Doctor's records of the side effects of medication. *White*, 312 F. App'x at 781, 790. For *White* to be apt to this case, Plaintiff must provide the medical evidence in support of his argument, which he does not.

**6. The accuracy of the RFC relative to inquiry with the VE.**

Plaintiff asserts that the ALJ's inquiry with the VE did not include all of Plaintiff's limitations. Plaintiff is incorrect.

The ALJ inquired of the VE about light work that was limited to simple, routine, repetitive tasks and occasional interaction with the public; about being absent more than two days a month; and being off-task 15% of the workday. (ECF No. 6-2, PageID.76–77.) Plaintiff asserts that the ALJ failed to account for his moderate limitations in concentration, persistence, and pace; and failed to account for medication side effects.

A VE's testimony substantially supports an ALJ's finding that a plaintiff can do other work if that testimony is in response to a hypothetical that accurately portrays the plaintiff's limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). The ALJ "is required to incorporate only those limitations accepted as credible" into the hypothetical posed to the VE. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Plaintiff's assertion, here, largely mimics the arguments above, which were dispatched unfavorably to Plaintiff. Clearly, the ALJ did not find Plaintiff's additional limitations to be credible, particularly when Plaintiff here has not cited to supportable medical evidence other than his subjective complaints. Further, the fact that the ALJ inquired of the VE about a limitation about occasional interaction with the public,

or limits to absent days or off-task time, does not require that the ALJ include those limits in the RFC. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 247 (1987).

Plaintiff again asserts that there was a failure to account for his moderate limitation in concentration, persistence, and pace, but that is incorrect, as the ALJ included the limitation of simple, routine, repetitive tasks, based on the report of Dr. Csokasy.

Plaintiff asserts there was an error between the VE inquiry and the RFC, as the VE inquiry included the limitation of occasional interaction with the general public, and later the less restrictive RFC (absent that restriction) found the same jobs and number of jobs that Plaintiff could do in the national economy. The fact that the VE did not inquire of these limitations separately and collectively to ascertain the jobs and their respective numbers is not a reversible error. It stands to reason that if a more restrictive hypothetical inquiry produces a substantial number of jobs in the national economy, then a lesser restrictive RFC would not reduce the same. *See Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 845 (6th Cir. 2005) (it is not a reversable error for a hypothetical that was more favorable to Plaintiff—in that it had more limitations—than the RFC that was assessed).

### H. Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 8), **GRANTING** the Commissioner's motion, (ECF No. 9.), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days

after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 18, 2021

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge